We will hear our argument this morning in Case 17-646, Gamble v. United States. Mr. Chayton. Thank you, Mr. Chief Justice, and may it please the Court. The separate sovereigns' exception to the Double Jeopardy Clause is inconsistent with the text and original meaning of the Double Jeopardy Clause. There is no dispute that the text of the clause was understood to incorporate English practice, and there is no practice of intersovereign successive prosecutions in all of English history or in American history for the first century of this republic after the framing. There is also a mountain of affirmative evidence that in England, even a foreign acquittal by a court of competent and concurrent jurisdiction bars a subsequent prosecution in England for the same offense. Your leading authority is a foreign prosecution in England in the Spanish case. And the argument on the other side, which has some traction, I think, is that it would be quite unusual or surprising for the new American republic to look to Europe in a question like that, because one concern that applies both in the English situation as well is that it would be a significant intrusion on sovereignty, a particular concern of the new American republic, to allow a foreign prosecution to limit the authority of the United States. And frankly, it would be surprising even in the English case. I mean, the relations between Spain and England were not exactly the best. I mean, if it were a Spanish case involving the murder of Englishmen, would the English court really have said, well, he tried in Spain, so our hands are tied? Well, there's overwhelming evidence, as I said, that that is the English rule, and there's no dispute that the framers were incorporating English practice into the double jeopardy clause. Any country in the world? Any country in the world? Yes. I'm sorry. If there's a prior criminal proceeding, either an acquittal or a conviction, any country in the world that would count? So there are a few requirements. One, it would have to be the same offense, so you would have to meet the English standard, which is, in fact, the standard of this court today. It isn't clear. I mean, I thought when I read your brief, well, you're absolutely right. But then I read the other side on the practice. And now I'm not going to say you're absolutely wrong. But three times the court has considered your arguments, looked at those cases, the English case Hutchinson. No report. Later cases refer to it. There was a complexity involving a special commission designed to try people who had committed murder outside the country. The king's bench didn't have authority. The king's bench referred it to that commission, and that commission said, well, he was acquitted in Portugal, and therefore we will not try him in this special commission designed to da-da. And does that reflect a principle of law? Does it reflect something about the commission? Does it reflect something about the individual circumstances? So far, it seems to me no one has any idea. If you read Gage, you'll discover the other side's argument. And the same is true of the early cases. I won't go through all of them here. But the early cases, we find some. Some support you, and some don't. So I do think they all support us. They all support you? Yes, I do believe they all support us. And the one case you mentioned that potentially leans the other way is Gage. But it's a civil case, and it's analogizing to Hutchinson for the purposes of a rule about recognition of civil judgment. And there is no ancient rule rooted in Talmud and Roman law and Greek law and canon law and ancient English common law to have your civil judgments recognized by another court. It's not to be prosecuted for a successive prosecution. And the point is not— May I ask you to just step back until you complete your answer to my question? I'd ask you any country in the world, the judgment of any country in the world. So if you're asking me what the English rule was, I would say, yes, that is. But there are three important qualifications on the rule. First, it does have to be the same offense. So there is no dispute in the case of the murder in Portugal and the trial in England or the murder in the Cape of Good Hope and the trial in England that those were the same offense. They were both murder. But sometimes that's a little more complicated because it has to be the same elements. That's the meaning of same offense under this court's jurisprudence and under the original meaning. Secondly, and this is very important, the second court has to recognize the competent and concurrent jurisdiction of the first court. That's part of the English rule. And there's no dispute. Whatever may arise in the international context, there's no dispute that Alabama and the federal government have competent and concurrent jurisdiction over the offense of being a felon in possession. So at least in this country, the answer seems pretty clear because the rule was a concurrent jurisdiction rule, and there's no doubt that there is concurrent jurisdiction. I don't think the idea even at the framing that he would recognize an acquittal in another country as a bar to prosecution could possibly be so shocking because it was mentioned in Furlong. It was discussed in Furlong. What's the third requirement? The third requirement is that it can't be a sham prosecution or a collusive prosecution. It can't be a sham. So today, let's say a group of American tourists are murdered by terrorists in a foreign country, and there is a prosecution in the foreign country for murder, the same offense, in a court of competent jurisdiction there. And it's not a sham prosecution, but it's a fairly inept prosecution, lack of prosecutorial and investigative resources in a poor country, and it results in an acquittal or a conviction with a very light sentence. And your position is that there could not be a prosecution here in the United States under the statute enacted by Congress to permit the prosecution of individuals who murder Americans abroad. So let me address that in a few different ways. One, the original understanding was that it applied between countries. Yeah, well, could you just answer whether that's correct or not? And if it's not correct, why is it not correct? Under the original understanding, it would be up to the U.S. court to determine whether it's going to recognize the competent and concurrent jurisdiction of that other country. What I'm saying is in the case of federal and state relations, there is no dispute about that. But I don't think this is a surprise question or a particularly difficult one. It is a court of competent jurisdiction. It is the court that in that country has jurisdiction to try offenses for murder. No question about that. So your answer is, can they be prosecuted here or can they not be prosecuted here? The answer is not just that the particular court is competent jurisdiction. It's that we're going to recognize the jurisdiction of the other country over the crime. This was the point that Furlong was making about the murder of a British subject by a British subject on a British ship. And Furlong says it's pretty doubtful that England would actually recognize a U.S. acquittal in that case because England would say you have no basis for concurrent jurisdiction over that crime. So that's the determination the U.S. court would make. You don't have to reach that question in this case. Our point is that if that was the rule, if that was the original understanding at the time of the crime. We do have to reach that question because your position logically would extend to Justice Alito's hypothetical. And if prosecution is part of the national security efforts of the United States, federal prosecution, then your position would substantially hamper those national security efforts. So I'm saying the reason you don't have to reach the question is obviously this is a case involving an Alabama crime and a federal crime. The logic of your position. The logic of our position, though. But the point is whatever the court's ruling in that case were it ever to come up, which I think is exceedingly unlikely, this is a different case because it's so much stronger. If the original understanding was the rule applied between foreign countries, then a fortiori it should apply between a federal government. Yeah, a fortiori. But you say, I wonder whether you have perhaps exaggerated in saying there's a mountain of support for your position. But your main support is a rumor of a decision involving a prior prosecution in Portugal and then the possibility of a subsequent prosecution in England. So it's a foreign prosecution. So it's true that's not what's involved here. But your argument is based on foreign prosecutions. The original understanding was based on foreign prosecutions. The point is, and on the question presented here, a fortiori it should lie between federal and state government. There is a principled basis for limiting this to governments bound by the Double Jeopardy Clause if the court wanted to do that. I think the point is that you're asking us to write an opinion which is based on this original understanding. And the original understanding, as you put it, applies between foreign countries. And a fortiori it must be that our decision would apply between foreign countries. The original understanding is it would. That's what your brief is all about. That's what you're asking us to say, that the original understanding was that there would be no double jeopardy bar between different sovereigns when those sovereigns are foreign countries. So how could we avoid that consequence? Well, first of all, I'm not sure the case is ever going to arise. But this is the state of Alabama and federal government, and it's undisputed concurrent jurisdiction. The rule is a rule of concurrent jurisdiction. So it's when is the U.S. going to recognize the concurrent jurisdiction of another country? And, again, I just wanted to say that Murphy v. Waterfront Commission is a case where the court held that the self-incrimination privilege applies cross-jurisdictionally. The court subsequently limited that to parties bound by the double jeopardy clause. So there is a principled way of doing this if the court ever gets such a case and wants to do that. And I would like to emphasize that no one in any of these briefs has pointed to a pattern of intersovereign successive prosecutions between nations that is going to be disrupted by our rule, even if the court were to suggest that it would also apply between foreign nations. We've been through all this in Bartkus, right? I don't think the court has been ever given this question a full and fair opportunity, certainly post-incorporation. And it's important to understand how the holding of this court arose. There was, of course, a suggestion in Fox v. Ohio in 1847 that there might be a separate sovereigns exception. It was based on a non-incorporation rationale. But no one actually – it's dicta. It's the purest dicta because there were no intersovereign successive prosecutions. Not only not in that case, but no practice of them. The first time this court had a chance to actually hold whether that's permissible was Lanza. And I think it's worth reading the respondent's brief in Lanza, Lanza's brief. There was no representation of the position we're presenting here. The brief was incoherent. And the court said, I think what counsel is arguing is that the separate sovereigns exception doesn't apply in the particular context of the 18th Amendment, given the concurrent powers of the states. None of these concerns were presented in Bartkus, though, right? Excuse me? None of the concerns you've been talking about there were presented in Bartkus. So, I'm just – Bartkus was decided at the same time as Abate. Abate is the case that answers this particular question. Abate remarkably says, we're just going to adhere to Lanza because none of the issues that are presented today are different from what was presented in Lanza, which is a really remarkable statement. And Abate is also pre-incorporation. Bartkus, obviously, is a due process case under the burden of HELCO v. Connecticut. And the evidence that we're presenting here was not fully presented in Bartkus. Could you say a little bit more about why you think incorporation or the lack of incorporation had anything to do with this question? Yeah. So, Fox v. Ohio, its lead rationale is non-incorporation. And, I mean, I think it's wrong, but it clearly said that, and then Lanza picked it up, and then Abate picked it up. And I think what the court – I mean, there is that reference in Fox. But it honestly makes no sense that incorporation would be the basis of the doctrine, because if incorporation were the basis of the doctrine, you would have a doctrine that only cuts one way. In other words, it would – the court would have held that the federal government can't prosecute an individual for the same offense after a state prosecution, but not the other way around. So the fact that there's not a one-way ratchet, but that, in fact, it's a symmetrical rule, suggests that incorporation has nothing to do with it at all. I think what the court was getting at was the – I think it was the baronial logic of it was that offense must mean federal offense, because the double jeopardy clause only applies to the federal government. That's what this court was getting at. That's what was picked up in Abate and Lanza, and that's what's no longer true. So as a – I don't think it was a legitimate rationale to begin with, because it conflates two things that are different, to which government does the clause apply and what prior offenses count for double jeopardy purposes. That was the rationale. It's interesting. I don't know that the government is defending that rationale. They completely ignore the non-incorporation rationale. I guess what strikes me, Mr. Chayton, is that you can say, well, you know, this case was a little bit different. In this case, the arguments weren't properly presented. In this case, there's something else that's the matter. But, you know, this is a 170-year-old rule, and it's a 170-year-old rule that's been relied on by close on 30 justices have voted at one time or another specifically for this rule, not an application for this rule. And, you know, part of what stare decisis is is a kind of doctrine of humility, where we say we are really uncomfortable throwing over 170-year-old rules that 30 justices have approved just because we think we could kind of do it better. Well, I mean, I disagree with the 170 years because, again, it's dicta in Fox v. Ohio. And I think it is important to look at the rationale when the court finally had an opportunity to decide this and make a holding on it, and that is LAMSA. And there's nothing resembling an argument for the original understanding the Double Jeopardy Clause was presented in LAMSA. That was picked up in Abbate. And all these cases are pre-incorporation. The court has held repeatedly that jurisprudential changes are a reason to revisit a doctrine. But why is the doctrine wrong? Given the uniqueness of our system of government, because there wasn't and isn't a comparable system in England at the time, there were not separate sovereigns. There was one sovereign, England. And one of the cases you rely on involved Wales. And so the application of the rule there makes absolute sense in that context. But the logic of all of our cases relied on a simple theory of what the sovereignty between the states and the federal government are. And you haven't really explained why that logic is not sensical. Well, the logic of the English rule, as reported in numerous treatises from the early 18th century through the 20th century, it's still the rule today, is that where there's a court of concurrent jurisdiction, even if it's another government that has concurrent jurisdiction, then an acquittal there bars a subsequent prosecution. Do you have any current case that describes the English rule that way? Current case? A current case. So I refer the court to two things. One, the famous Professor Grant article, Successive Prosecutions, tracks the law of England and the British Empire into the latter half of the 20th century. There was a case in 1985, Regina v. Thomas, in which the court describes and applies the rule. I don't think the idea that this is not the English rule is a serious argument. Do you know how this rule applies within the European Union? It applies the same way that we are urging here. That is my understanding. The question, I thought, perhaps Justice Kagan and Justice Ginsburg and Justice Sotomayor are asking, as I understand it, in any case, I'm asking. I have spent a certain amount of time in these old cases. I think that Bartkus in this court says there were three with you, three against you, two undecided. I don't find it quite as clear, but I'll go back and look at them again. But suppose you're right. Maybe Marbury v. Madison was wrong.  Look at the briefs. Look at the door we are opening up. And here, you have read the briefs. There are briefs that say, remember the civil rights world where people were with victims of a different race, simply killing them. Or worse. And the state would just, don't worry, they will never convict, and they didn't. Or, think of the brief here with the Indian tribes, where it is saying that we need this kind of thing for abuse of women. And think of the case of prohibition. And think of the cases that you have seen. Now, what I look for, in your briefs, which I haven't found yet, but for the military, is, is it really the case or not, that as a practical matter, if you go back the last ten years, or five, or whatever it is, you found a whole lot of cases where people were prosecuted twice by different sovereigns for what was the same thing. Because I didn't see them listed here in any brief, but for the military. And, therefore, to me, that's an important question. Well, we can't know for sure how many successive prosecutions there are. Of course, I don't expect you to know for sure. Well, and I want to say, the reason I'm saying we can't know for sure is because the government's petite policy is a secretive policy that they implement, and they don't really share data on it, other than the prosecutions they've declined to make. Sources from the early 2000s say that they've authorized 150 petite authorizations per year. There's reason to believe, I think, and first of all, let me step back and say, I don't think that should dictate what the constitutional rule is. There's no minimum number of constitutional violations that triggers this Court's duty to enforce the Constitution. But I think there's every reason to believe that the use of this inner sovereign prosecution, particularly federal after state, for the same crime is increasing. You can just see the facts of this case. It is really difficult. How much does Rothberger strengthen significance? Because if there's a different element in one, that's enough to take it out of double jeopardy? If each has an element the other doesn't have, then, yes, that's enough to take it out of double jeopardy. And that makes sense when you're talking about federal and state government, because if the federal government has made a considered decision that there's some substantial federal interest here, they can define the crime in a way that's probably going to be different than crimes that states prosecute, which are local crimes. Do you know how that would go under the civil rights cases? Yes. So, one, I want to note that on the civil rights concern, the ACLU has supported us, other progressive organizations have supported us. The Howard Civil Rights Clinic, the Howard University Thurgood Marshall Civil Rights Clinic, has filed a brief in support of neither side. But I believe it's quite helpful to us because it explains why, if the Court adopts our rule, it is not likely to be a problem for civil rights prosecutions. The main tools for federal civil rights prosecutions are 18 U.S.C. 241 and 18 U.S.C. 242. Well, that would be the case if the Blockburger Rule holds. But your interpretation of the term offense in the Fifth Amendment is perhaps inconsistent with the way this Court has interpreted that concept in Blockburger cases. Isn't that true? I don't think it's the least bit inconsistent. I think if you look at — so the current understanding of the Blockburger Rule derives from Justice Scalia's dissent in Grady v. Corbin, which was adopted in Dixon, and it's exactly what we're saying it is. It's a crime defined by the same elements or — Didn't he say it is the elements defined by a particular sovereign? I don't believe he actually said that in Grady v. Corbin, and I don't think the Court said that in Dixon. There was nothing sovereign-specific about it. The government tries to say that it's necessarily a rule of legislative intent, which makes it sovereign-specific, but that is not what the English authorities said. Can I go back to the way you began? I mean, you told us that there is a mountain of evidence supporting your interpretation of the original meaning of the Double Jeopardy Clause. Put aside Hutchinson and put aside the case involving Welsh law that Justice Sotomayor referred to. Can you cite any 16th or 17th or 18th century British case in which a foreign judgment actually barred a prosecution in Great Britain? In Great Britain? Well, it's Hutchinson. The actual holding of Roche was that the plea of outrefaux acquit based on foreign acquittal would be a bar, because that was necessary to the Court's decision. The Court was deciding whether the defendant could plead that and innocence at the same time and said it couldn't because the plea of outrefaux acquit based on foreign conviction would be a bar. It's true that the Hutchinson — Well, there are questions about Roche. In the version of the opinion that was available at the time of the founding, was Hutchinson even cited? Hutchinson wasn't cited, but Roche on its own — Roche on its own stood for that proposition. And then in 1800, the Hutchinson explanation was added to the opinion. So this is a mountain? The mountain — I would primarily start with the treatises. And by the way, in the Grady v. Corbin dissent, the entirety of the English common law evidence that the Court — that Justice Scalia relied on that then became the opinion of the Court in Dixon was five treatises, one pre-ratification case that was dicta, and one post-ratification case that adopted it. So that was the way the originalist inquiry happened. If you want to know what the public understanding of the rule — Do you have any evidence of that? Most of these treatises, with the exception of Blackstone, which was every lawyer's Bible at the time of the founding. But there's almost nothing in Blackstone about this. These other treatises were well-known to the members of the first Congress and to the members of the state ratifying conventions. They had these treatises on their bookshelves, and that was what they looked to. Do you have any evidence of that? Yes, these treatises were — all the treatises we cite were available in America. They were well-known treatises. The Bowler Treatise, which the government seems to enjoy taking potshots at, the Bowler Treatise was written by Sir Francis Bowler, who was a member of the King's Bench at the time of the framing. It is cited in numerous cases in this country, pre-framing and post-framing, for criminal law principles and civil law principles. Three of the five treatises that Justice Scalia relied on in Grady v. Corbin are treatises we rely on here, Hawkins, Starkey, and Chitty. But those treatises don't cite any actual authority. Those treatises? What actual authority, what holdings of pre-Fifth Amendment adoption courts are cited in those treatises? McNally cites Hutchinson and cites Roche. Hutchinson? It doesn't just cite them, it discusses them. Do we have the opinion in Hutchinson? There is a bail notation, and that is the only thing that survived, and the scholarship has long noted that that was from one phase of the case. But it doesn't matter. It doesn't matter because we have the King's Bench repeatedly saying, this is the rule, this is the rule. And the government cites not a single authority to the contrary, stating an opposite rule. Counsel, I apologize for ping-ponging you from the framing back to the present, but I'd like to return you to Justice Breyer's question about the impact this might have on civil rights organizations and others, you know, the stare decisis considerations, one of which would be, are we upsetting settled expectations currently? Well, I don't think it would have an impact on civil rights litigation. As I was saying, I think the – Sorry, but I'd like you to develop that further. I didn't get a complete answer. Sorry. And so I mentioned that the primary tools of the federal government in the area of civil rights prosecution are 18 U.S.C. 241, 242. 241 is conspiracy to deprive someone of their constitutional rights under color of law. 242 is actually doing it. Those aren't going to be the same offenses as, say, a murder or an assault. Now. Now. But a state – I can't foresee the future, and it wouldn't be that hard. It wouldn't have been. Well, in the federal government – You see, look, what's actually bothering me is, yes, I know you're convinced on the history. I also know that there is maybe less clear than you think, but maybe not, that this court several times has looked at the history, and they said it's inconclusive, and therefore – and now we have a rule that's been there a long, long time. And if we're going to go back and look to whether this court got the history right in cases, I have my own candidates. Is that – So I don't agree that the – So now my problem is that. My problem is, is this a basis for going back? The same one. The same question, but I haven't heard the answer that Justice Kagan said. So two responses. One, if I could finish on the civil rights issue, I just wanted to add that the federal government can take control in all manner of ways. In a particular case, they can take custody of someone via an ad prosequendum writ. If Congress – if states were becoming uncooperative in the area of civil rights, and this were really a problem, which it doesn't seem to be today, the federal government could preempt certain state crimes. There are any number of ways that the federal government could take control if in the future there were these problems that we can't foresee today. And then as far as the history being analyzed in several opinions of this court, no. Which, respectfully, Your Honor, I disagree. It is one footnote in one opinion. It is footnote nine of Bartlett. I think the question, though, is, of all the errors this court has made over the years, why this one? Why should we care about this one? Well, we should care because there is an ancient right not to be tried twice for the same crime. And the original understanding of the double jeopardy clause considers this the same crime. It would allow – I'm sorry, please. You should care because we've cited examples of cases where a state court acquitted someone of murder and the federal government – Counsel, I'm sorry to interrupt, but I think we've got that. Okay? I think it's just a practical question. It took until last year for this court to overrule Korematsu. Why is this case practically today important? It is important because we currently have a rule that allows the federal government to come in and decide they didn't like the way a state prosecuted someone or the results of the prosecution or the sentence they got and re-prosecute them. It's precisely what happened in this case. There's every reason to believe it happens with some regularity, and the court can put an end to it. Well, I guess the question that underlies Justice Breyer's question about civil rights is something along the lines of, you know, that's consistent with our structure of government. We have dual sovereigns. That means dual regulation, and dual regulation often means dual punishment. And if we were to adopt the rule that you suggest, it might very well be that either the federal government would have to subordinate its interests to the states or that the states would have to subordinate their interests to the federal government. And one of the things about our constitutional structure, which makes it unusual, is that both sovereigns are understood to have significant interests that they have the capacity to pursue. But when they have this concurrent jurisdiction over something that is the same offense, that is illegitimate for reasons that were understood at the framing. Take the cases of – take Furlong. That's a case where multiple sovereigns have concurrent jurisdiction over robbery at sea, and it was well understood that a prosecution by one would bar a prosecution by another. Yeah, well, I read Furlong a little bit differently as actually separating out the offense of piracy, which was an offense that sort of was in common, versus the offense of murder, which Furlong says, yes, each different jurisdiction can prosecute the offense of murder. The murder of a British subject by a British subject on a British ship is what they were saying. They weren't drawing – they were just applying the concurrent jurisdiction rule, and they were saying why would the U.S. have concurrent jurisdiction over that. I suppose my main question, which actually goes back to Justice Gorsuch's question, because Justice Gorsuch has been trying to lead you away from something, and I'm a little bit also confused as to why your argument seems, frankly, a little bit one-note. You know, your brief and now your argument is just all about the original jurisdiction, and there are some people on this bench that think that that is the alpha and omega of every constitutional question, but there are other people on this bench who do not, who think that 170 years of significant practice where 30 justices have signed on to a rule, that you're going to have to give me more than the fact that, you know, actually pretty early on in the republic they decided that that was not what the original understanding was, even if they're wrong, and so this is your opportunity to give me more. Okay. 1922, I would say. But my opportunity in response to your offering me an opportunity to give you more, I will tell you incorporation. Incorporation, incorporation, incorporation. The Court has said its own precedents are that incorporation makes a big difference for purposes of stare decisis. So look at Elkins and look at Murphy v. Waterfront Commission. After incorporation, the federal government and the state government shouldn't be able to combine to do that, which they can't do alone. Part of the original understanding as well was stare decisis. Stare decisis is a principle, in my view, rooted in Article III, as Federalist 78 points out, and as Justice Kagan points out, it's a doctrine of stability and humility that we take very seriously, and the reason with the bar that you have to clear, I believe, is not just to show that it's wrong, but to show that it's grievously wrong, egregiously wrong, something meeting a very high bar, because stare decisis is itself a constitutional principle. And given, as Justice Alito says, the uncertainty about the history, can you clear that bar? So two questions. Is that the right way to look at it, grievously wrong? And two, how can you clear that given some of the uncertainty? So I'm not sure grievously wrong is the right way to look at it when you're talking about an unconstitutional law enforcement practice, because this Court has never upheld it. That's begging the question. The whole point is that there are prior decisions going back, as Justice Kagan says, many years, reaffirming this doctrine. And the question is, when are we going to upset that stability? When are we going to depart from the humility of respecting precedent and overrule it? Your brief uses egregiously wrong. I use the term grievously wrong. Well, and I agree this rule is egregiously wrong. It's a rule that there was no practice for all of English history, no practice for the first century of this republic. That alone, I think, speaks volumes. And I think going back to incorporation, I think, in addition to just how wrong the rule is, as explained by many jurists and many scholars over many decades, I think incorporation, the Court has never had a full and fair opportunity post-incorporation to revisit this rule. How does it work as a practical matter? Is it a race to the courthouse? I mean, if a prosecution bars a subsequent one, the state and federal government may have different perspectives. Is it whoever can impanel a jury first is going to block the others? So I don't think so. So, first of all, the norm in the country is cooperation between federal and state authorities. There are just, speaking of one agency in one area of law. Well, it sure wasn't entirely true at the time of the civil rights actions in the 60s and 70s. It wasn't true at the time of the Fugitive Slave Law. Well, as a practical matter, I think it is true today. Secondly, Blockburger has been subject to enormous criticism because it isn't defendant-friendly enough. When you apply Blockburger, oftentimes these aren't going to be the same offenses. And this is a critical, critical point. We have had an experiment in this rule. The experiment is that between 20 and 37 states already bar successive prosecutions after a federal prosecution or by another state as a matter of state law. And where is the rates to the courthouse concern in those states? Where are the law enforcement problems in those states? They don't exist, and I don't think Texas and the government have ever even really responded to that point. If I may, Mr. Chief Justice, I'd like to reserve the range of my time. Thank you. Mr. Fagan. Thank you, Mr. Chief Justice, and may it please the Court. Throughout its history, this Court has correctly recognized that the distinct and separate sovereign powers of the state and federal governments make state and federal crimes different offenses under the Double Jeopardy Clause. Petitioner provides no reason for this Court suddenly to conclude that it's been wrong all this time, and overturning 170 years of precedent on this issue is going to invite a whole host of problems that this Court has thus far been able to avoid. Well, 170 years, I think your friend is right, isn't it, that we have not had a full consideration and exposition of the issue in any of our precedents? I don't think that's correct, Your Honor. I think, as you yourself pointed out earlier in the argument, the historical point that he is making here, and that is the centerpiece of his argument, that even prosecutions by a foreign sovereign can bar domestic prosecution by a state or by the United States, was fully before the Court in Bartkus. The grant article that is all over the Petitioner's brief and that Petitioner's counsel cited in argument today was cited by Justice Black in his dissent in Bartkus, and all the authorities on which he's relying, with the exception of Roche, which correctly understood doesn't actually announce this rule, were identified by Justice Frankfurter for the majority in footnote 9, and the Court found these authorities to be dubious and of limited value because they don't really speak to our federalism. But you have to concede, won't you, that this rule, this separate sovereign rule, has been widely criticized by both academics and federal judges? Your Honor, it has come under some criticism, but I think what's worth noting is a lot of the articles that criticize it also recognize that some exceptions are necessary, and that successive prosecutions and separate prosecutions are sometimes necessary to vindicate particular sovereign interests. So take the civil rights brief that my friend was just mentioning. They think that this Court, if it goes for the position the Petitioner is advocating, should then announce a separate constitutional doctrine that saves civil rights prosecutions. And that's because they realize the enormous consequences that overturning all this precedent would have. I thought the answer to the civil rights cases is it's not the same offense, 241 and 242. There are no state law counterparts to those. Your Honor, those aren't the only civil rights charges we bring. So in the recent shootings of the synagogue in Pittsburgh and of the African-American church in Charleston, we've charged those with offenses that, I mean, I can get into the details if you'd like, but they're essentially murder plus a bunch of elements. And those would be Blockburger. Once you say a bunch of elements, then you get into Blockburger. No, Your Honor. Murder would be considered a lesser-included offense of those offenses if the offenses defined by different sovereigns were considered the same as Petitioner's urging. But that's not even the only consequence. There are a number of categories of cases that would be put at issue here, and I can get into more detail on those in a moment. But before I get to that, even the possibility of claims like this creates adverse consequences for law enforcement, for legislatures, and for courts. Well, you must think that there's some problem or you wouldn't have the Pettit policy. I mean, that's an odd defense of a position to say, well, we take care of it somewhere else, so don't worry about it. Well, no, Your Honor. I think there are a number of instances, including the double jeopardy clause just last term, where plurality of this court has recognized the Constitution doesn't solve every potential policy problem that may arise, and we leave a lot of those questions for legislatures. Or for the political branches in general. And I think this has actually been a real success story of that, because he was just asked if he could point to any significant practical problems, and he couldn't. But I can point to a lot of practical problems that are going to arise if this court adopts his rule. So on the law enforcement side, just the possibility that this could happen is going to deter cooperation, encourage aggressive prosecutions, a race to the courthouse, and defendants trying to play each sovereign off against the other, where one sovereign will have the ability to unilaterally bargain away the other sovereign's ability to enforce his interests. And I'd like to get into some concrete examples of that in a second. But as to legislatures, he said it himself, this would incentivize Congress to preempt state law in more circumstances, and it's going to also incentivize... What about a case like this? This very case. A felon in possession. It's the same crime, federal and state. What is the manipulation that you see there? Well, Your Honor, the examples I would get into, and I'm happy to get into them, are examples of cases in which state and federal interests would be blocked. But speaking to this particular case, I don't think there's any dispute, at least by petitioner, that the federal government has a substantial interest in regulating access to the interstate market for firearms by someone who has twice fired weapons that endanger members of his own family and other members of the community. The only question is whether that substantial federal interest was vindicated when he entered into an omnibus plea deal with the state, where he wound up, as a practical matter, not receiving any additional time in prison for the firearm offense. Well, I think that's exactly the problem that is practically more apparent today, or at least a potential concern that counsel might have addressed. And that is with the proliferation of federal crimes, I think over 4,000 statutes now and several hundred thousand regulations, the opportunity for the government to seek a successive prosecution if it's unhappy with even the most routine state prosecution is a problem. Justice Brennan was concerned about it in Marcus. In that case, there was some evidence of manipulation even by federal authorities to secure a second conviction in state court. Why shouldn't that be a practical concern we ought to be more concerned about today? Well, let me say a few things about that, Your Honor. I mean, the reason we have the Pettit policies, we do understand that successive prosecutions are very often inappropriate, and we try to reserve them for circumstances in which the federal interest hasn't been vindicated. But I think to the extent that there's a concern about successive prosecutions, it's not so much successive prosecutions based on a particular law of one sovereign or another. Successive prosecutions for the same conduct all raise those concerns. But everyone agrees that successive prosecutions for the same conduct don't raise any double jeopardy concerns. That's why the Pettit policy, Mr. Chief Justice, is somewhat broader. It covers a subsequent federal prosecution following a state or federal disposition for the same act or transaction. But to get back to your question, Justice Gorsuch, I think that makes the double jeopardy clause not necessarily the appropriate vessel for vindicating that concern. Well, you know, I wonder about that, because in our prior cases, we hinged on two things, in Barkas, among other places. One was incorporation, and we were concerned that the federal government would be at a disadvantage compared to states without this rule, because states were not bound then by the double jeopardy clause and could pursue a second prosecution after a failed federal prosecution. So why shouldn't the reverse be true, we thought? That rationale has now disappeared with incorporation, and we've since revisited a very similar issue in the Fourth Amendment context in Elkins, where we used to allow federal prosecutors to use illegally obtained evidence, and now we don't. So that rationale seems to have, in fact, changed over time. So that might be one argument. And then the other is, again, in Barkas, we relied elsewhere on the promise that prosecutors wouldn't do this in routine cases. And, you know, at least to some eyes, this might look like a pretty routine case, as did Barkas itself. And why shouldn't we be concerned about those two things? Well, Your Honor, we don't view this as a routine case. First of all, you have to understand that the set of cases that could even come under the Pettit policy is already a very selective group. The federal government doesn't charge very many criminal cases as compared to the states, and then our number of Pettit policy approvals each year is about 100. And this case is important to us because it's a part of a program called Operation Safe Neighborhoods. The case studies have shown by focusing on recidivist offenders like Petitioner, we've reduced crime in some neighborhoods by up to 42 percent. But even if you don't like this prosecution, let me give you a few other examples of the kinds of cases that are going to be barred under his rule. First, there's the foreign judgment problem that the court was discussing with Petitioner's counsel, and that's not just a hypothetical problem. That's a real one, and let me give you a real example. In 2003, the FARC rebels in Colombia kidnapped American journalists and held them hostage for five years. And we have open indictments on that. And when there was the peace accord between the Colombian government and the FARC rebels, the charges against them in Colombian court were dismissed. Now, I'm not certain whether those charges, jeopardy actually attached in those cases under Colombian law or exactly what the elements of the Colombian law were, but that's precisely the inquiry we don't want courts to have to have. And we certainly don't want to have to file as the government. Well, why not? We do it in civil cases all the time, right? And we won't enforce judgments that are shams. We won't enforce judgments when there are different elements. We won't enforce judgments when jeopardy hasn't attached. So claim preclusion wouldn't apply. But why is it that civil defendants, corporations, business people, get the benefit of this rule but not criminal defendants, at least amongst us? Usually, Your Honor, there's going to be privity among the parties. Here, the Colombian government had a perfectly legitimate sovereign reason for forgiving this conduct in return for which the rebels admitted it and got amnesty. But that reason doesn't apply to the federal government. And the other thing that we can't do, and the thing that witness counsels... Wouldn't they say since there was never any trial that they were never in jeopardy? Well, Your Honor, I'm not sure how far the proceedings with respect to each and every individual rebel we might charge in Colombia got. But his only solution to this, and I can give you other examples as well, but just to finish this one up, his only solution to this is to ask the federal government to make a filing in U.S. District Court asking that court not to respect the judgment of a Colombian court. Now, we can't do that with respect to Colombian courts or French courts or Italian courts without creating enormous diplomatic problems for ourselves. And I don't think U.S. District Courts... Your Honor, is it a dismissal based on some amnesty? Is it anything like an adjudication on the merits? So, Your Honor, let me give you another example. There's the bombing of Pan Am Flight 103 over Lockerbie, Scotland that implicates the interests of numerous sovereigns. One of the bombers has been tried in Pakistan, and the U.S. might want to try that bomber as well. His rule would preclude that. And again, his only solution is to ask a U.S. court to declare that some foreign court is not a court of competent jurisdiction. And Justice Ginsburg, to your question before about what European countries do, it's not correct that European countries all have his rule. Germany, Italy, France, Belgium, and Austria are all countries that follow the same rule we do. In 2009... But as I understand it, and tell me if I'm wrong, the common law countries, Great Britain and Canada, do. Not all of them, Your Honor. Great Britain, it has become apparent recently that probably the best case is the Regina against Thomas case that my friend cited. It's become apparent recently that they do adhere to that rule, although even in Regina against Thomas, the prosecution, I believe, was allowed to proceed for other reasons. Canada's Supreme Court has reserved this question. And the idea that there's some international norm that sovereigns can't separately vindicate their own interests when they're implicated is simply not a rule. But let me focus just on... let's just turn to domestic... May I ask before you do that, you rely very heavily on federalism, separate sovereigns. Is there another case where federalism has been invoked to strengthen the hand of government, state and or federal, vis-a-vis an individual? Federalism is usually invoked because it's the protection of the liberty of the individual. But here, the party being strengthened is not the individual. It is the state's freedom and the federal government's freedom to bring... to prosecute for the same offense, so on and so forth. So I think the court's recognized in older cases, like Krupschank, which was from the 19th century, and in its recent first decision in Bond against United States, that one of the things that American citizens get by being citizens of both the state and the United States is that there are two sovereigns that can positively legislate, that is, pass affirmative legislation to protect them. So in the civil rights era, when the states weren't affirmatively protecting civil rights of their citizens enough, they're also American citizens, and the United States stepped in to vindicate those interests. You've seen a different crime, not this broad variety assault, murder. So, Your Honor, there are civil rights offenses on the books now, like 18 U.S.C. 249, which criminalizes causing bodily injury to someone for racially motivated reasons. It could be double jeopardy barred under their rule. But let me give you some other examples. Just before we get to more examples, I thought Justice Ginsburg's point was worth exploring a little bit more. I thought in this country the people were the sovereign, and that sovereignty was divided, exercise of sovereignty was divided, not multiplied. So it was divided between the federal government and the state governments, Ninth and Tenth Amendment. And that it is awkward, isn't it, to say that there are two sovereigns who get to multiply offenses against you. I can't think of another case where federalism is used, as Justice Ginsburg indicated, to allow greater intrusions against the person rather than to protect more against them. Well, Your Honor, the people have vested the sovereignty in both the state and the United States. Is there such an example? Is there such an example other than double jeopardy where the individual has a double whammy, both the state and the federal, usually federalism, as Justice Gorsuch just pointed out, or protective of the individual? Well, Your Honor, it is a common fact of life that everyone is subject to both state and federal regulation. It's why everyone in this room, except maybe my friends from Texas, pay both state and federal taxes. It's why businesses are regulated by both the federal and state governments, and why everyone knows that an act, and even Petitioner agrees, the same act can be both a state and federal crime. What about the adoption of the Blockburger Rule as opposed to the same transaction test? So, Your Honor, I think the… That's a rule of federalism in a way, and yet it exposes defendants to prosecution for the same acts in both federal court and state court. I think that's right, Your Honor. It would respect the judgments of the legislatures as to how they wanted to craft their crimes. Blockburger… It's a double jeopardy. We're talking about double jeopardy, whether it's Blockburger or this case. I ask outside the realm of double jeopardy. Is this a solution? Your Honor, I think I've just given several examples of cases where people are regulated more heavily because there are two governments than they would be if they were subject only to one unitary government. That's a necessary consequence of our system, and the Court has repeatedly recognized it. May I ask, Mr. Fagan, do you think that there's a prospect of abuse where two different governments can use the possibility of prosecutions as a bargaining tactic to get defendants to agree to plea deals? Is that something that happens regularly? I'm not really familiar with that being a serious problem under the current system. I think the main concern would actually be the opposite under the new unprecedented system that Petitioner is asking this Court to adopt, where someone could go into the state prosecutors, let's say someone's caught in California with 100 kilograms of marijuana, which is a misdemeanor in California, as the states point out in their brief, but is a felony under federal law, and he agrees to plead to the state offense, and therefore that would bar a federal prosecution for possession with intent to distribute, which would be considered, under his rule, a greater incumbent offense. Do you remember what the situation was in D.C. not so very long ago when we had the same prosecutor for the local courts and the federal court, and the D.C. Code had lower penalties than the U.S. Code, and the prosecutor engaged in just that kind of tactic, plead guilty under the D.C. Code, and if you don't, I'm going to indict you under the U.S. Code. Well, Your Honor, D.C. is kind of a special case where both of those fall under federal government. It's like Puerto Rico in that sense, in that they're not separate sovereigns. But here's another problem we've run into in Puerto Rico, now that we can't rely on the separate sovereign understanding of the Double Jeopardy Clause there, is that the territorial prosecutors in Puerto Rico don't view the prosecution of crime in quite the same way as the federal government does. They're more concerned with crime of a transactional nature rather than necessarily developing longer-term investigations. And so one thing that they do is they frequently prosecute drug conspiracies that last only for one day, an agreement just to sell particular drugs from a particular location on a particular day. And at least one district court has dismissed a federal indictment for a broader drug conspiracy that occurred for over a range of years on the ground that it was simply a greater-included offense of the smaller Puerto Rico drug conspiracy. And that's just a consequence of the different ways in which the state and the federal government use their resources and the ways in which they want to prosecute crime. Another difficulty that's going to arise here is prosecutions by the federal government that follow tribal prosecutions, which I think are about two-thirds of the few hundred successive prosecutions that we bring each year. And as this court recognized a couple of terms ago in the United States against Bryant, the federal government plays a critical role in curbing the serious problem of domestic violence against Native American women. Tribes are limited generally to prosecuting only for misdemeanors. So if they find that someone has been committing domestic abuse, the most that they can do is prosecute that person for a misdemeanor. Under federal law, 18 U.S.C. 117a, we can prosecute for recidivist domestic abusers for a felony. And the tribes bring... What is the reason for the tribes' very limited jurisdiction? So the tribes have limited jurisdiction as a consequence of federal law. Some tribes are allowed to do more serious offenses in exchange for providing more protections in their courts. Very few have decided they want to make that tradeoff because it would require them to dispense with some of the traditional accoutrements of tribal justice that are important to their tradition. So as the court noted in the United States against Wheeler, justice in tribal courts is more focused on restitution between the defendant and the victim and less focused on incarceration and deterrence and the kinds of treatment programs that they can receive in federal prison but that they're not going to be able to receive in private prison. I just wonder if you want to say a few words on a slightly different thing, which I don't know if you have anything to add to what's in my mind, and I've never been able to formulate a principle. I looked at the history. It's not just a footnote nine. It's a whole discussion in Frankfurter's opinion, which is on your side. But they have a pretty strong argument on their side. Then you've pointed to some problems, and I'm sure they're real ones, but they don't seem like overwhelming ones in terms of how often they occur. Then you say, well, it's 100 cases where this applies every year in the federal part, and there are also 20 states, probably 50,000 federal prosecutions, something like that. There are 100 cases. And this has been around for 70 years, at least, 170 possibly, or somewhere in between. So how am I supposed to decide, in your opinion, about whether their arguments, which are passed, plus a certain unfairness, which Justice Black says pretty well, outweighs the stare decisis. You can't say never. Stare decisis is never. If it always holds, we wouldn't have Brown v. Board. But if it never holds, we're really in trouble in terms of the stability of the law. Okay? Wonderful. This has occurred to you, this problem. And do you have anything to say that will help me decide this kind of balance? Your Honor, I think they need to show a lot more than they have shown here in order to overcome this Court's consistent understanding throughout its history of what the Double Jeopardy Clause means. As Justice Kavanaugh pointed out earlier, I forget what adjective he used, but it was... Grievously. Thank you. You have to show that this was grievously wrong, and they haven't come close to doing that. I can talk about the history in a second, but just in terms of the consequences, there are very serious consequences. The consequences are going to multiply if you adopt their rule because everyone understands how to operate under the old rule. Their rule is going to create problems for courts comparing offenses across jurisdictions. May I ask you a question about issue preclusion? You say no Double Jeopardy doesn't operate state, federal state, but how about a case that has been tried in one system and the jury has found whatever it found, and then it's tried in the other system, and the identical conduct is the problem. Does issue preclusion operate? Are you talking in criminal law or in civil law? I'm talking about criminal law. So in criminal law, Your Honor, there is no non-mutual collateral estoppel. The Court said as much in Standefer. And this issue hasn't come up, of course, because the Court has understood that federal and state crimes are not the same offense under the Double Jeopardy Clause. Don't all your problems go away if you're the first to file, if you win the race to the courthouse? And I would assume the same is true with the states, and so what's most likely is that you and the states are going to sit down and develop a way of coordinating which cases you're going to file in first and which ones they're going to file in first. Well, Your Honor, I'm not sure that's true because I'm not sure that we're always going to cooperate. I think the history of this nation has shown that the federal government and states do not always see eye-to-eye on matters of criminal law enforcement, and there are going to be cases in which each has separate interests to vindicate. You could imagine federal prosecutors in California as a protest against... I'm sorry, state prosecutors in California as a protest against federal marijuana laws, allowing anyone who's caught with 50 kilograms of marijuana to walk in and plead to a misdemeanor to frustrate federal prosecutions. There are also going to be cases where the state prosecutors simply don't have perfect information, or maybe the federal prosecutors don't. So the state prosecutors might see something and just think it's a simple assault, and what they don't realize is that it's actually part of a racketeering conspiracy. And I'm not making up these examples, Your Honor. We see all the Pettit waiver requests, and the examples I'm giving the Court are real cases that have actually happened, or at least based on... So it seems like the ones that you can't cooperate, you could solve by getting to the courthouse first. Well, then we're not... Your Honor, then if there's a race to the courthouse, it deters state and federal prosecutors from cooperating even at the investigation stage. You don't have to take my word for it. If you look at the state and local government brief, that's exactly what they say. Can I ask one question on stare decisis that we haven't explored so far? And that's reliance. The government doesn't make a reliance argument here, as far as I can tell. It says there's going to be some systemic trouble if we were to change the rule, and confusion. But you haven't suggested, I don't think, that a prosecutor has a right to rely on an unconstitutional rule to put someone in prison. I mean, that wouldn't be a thing, would it? Well, Your Honor, I do think that it should weigh heavily on this Court that what it would be doing would potentially be letting people out of prison based on, I think, a rule that is at best... Just hypothetically. You wouldn't argue that the government has a reliance interest to keep people in prison despite an unconstitutional rule, would you? Your Honor, I think if they'd shown the kind of monumental or grievously serious evidence that they would need to show... Let's just say 51%. They've persuaded us 51% of the Constitution's meaning, under any sort of interpretation, just hypothetically, is against the government. Would it be appropriate in the government's view to keep people in prison in those circumstances? Well, Your Honor, it's hard to put an exact percentage on it, but I do think they would have to show this isn't just a preponderance of the evidence test or stare decisis means nothing. There's also something about the reputation of this Court and ensuring that this Court doesn't lightly overturn its precedents unless there is some monumental reason to do so. And they haven't shown any such reason to do so today. I mean, one further point I would make on that is that their entire argument is based on a historical principle that no court in the United States has ever adopted, which would be this foreign judgment bar principle. And the result that they would reach would be, I think, frankly, unworkable. They're not raising any arguments that this Court hasn't already considered and rejected. And in terms of... I'm sorry. Your Honor, you referenced earlier, as did Justice Kagan, the idea of stare decisis representing something about judicial humility. And I can't think of anything that's more antithetical to judicial humility than deciding that this Court all of a sudden has discovered some historical principle that has eluded its predecessors going back 170 years. They also raise, of course, a general principle of individual liberty, and we've often said, as Justice Ginsburg points out, that federalism is designed to protect individual liberty. I think your basic response to that is that actually that's wrong. In certain respects, this system of separate sovereigns means your individual liberty is infringed more often by double prosecution, double regulation, double taxation. Is that your answer, or do you have an answer other than that in response to the individual liberty concern? No, Your Honor. I think it's a very narrow and not correct view of liberty only to look at the liberty interests of the defendant. They're also the liberty... From the perspective of negative liberty, liberty, freedom from government oppression or government regulation, your rule strikes some, and this is what they point out, as an infringement of basic concepts of individual liberty. You didn't get me the first time. You're going to take another crack at it. Well, Your Honor, I don't think that's the right way to think about it. I think the framers decided that they were going to protect... May I finish, Your Honor? They were going to protect liberty in a particular way, and the way they were going to do that is by vesting sovereign power in the states and in the United States, which could both positively enact laws and protect people who may be victims of crimes. And they did not have any understanding that the United States or the states would be precluded from vindicating their distinct sovereign interests in their own sovereign spheres by the unilateral actions of the other sovereign. Thank you. Thank you, Mr. Fagan. General Hawkins? Thank you, Mr. Chief Justice, and may it please the Court. I'm here today on behalf of a broad and diverse coalition of 36 states collectively representing over 86% of the U.S. population. The states may disagree with one another about various policy issues, but we are united here in urging the Court not to overrule its longstanding interpretation of the Double Jeopardy Clause. To rule for petitioner, the Court would have to read offense to mean conduct without regard to sovereignty, overrule Fox, Lanza, Barkas, Abate, and Heath, allow one sovereign to potentially thwart another's ability to prosecute violations of its laws, give foreign powers a potential veto over domestic prosecutions, incentivize even— In the numbers you just mentioned, I thought we had heard from the other side that something like 25 states, something like that, do not have these separate sovereigns. One state versus another, state versus federal. Well, Your Honor, it's true that there are 20 states that have enacted a general sort of bar on their ability to bring a prosecution based on conduct that was already prosecuted by another sovereign. There are some quirks and differences within those states, but I think it's important to note that 14 of those 20 states are part of our coalition today. They have signed on to our amicus brief, urging this Court to leave that decision and those types of policy considerations to the states, which are already actively legislating in this area. Take the Commonwealth of Virginia, for example. The Commonwealth of Virginia generally bars a prosecution by that state when the federal government has already brought a prosecution based on the same conduct. But as recently as 2003, following the 9-11 attacks, Virginia amended its law to make an exception for terrorism cases. Other parties have spoken about potential exceptions related to civil rights, for example. I think the Virginia example shows that states are capable of recognizing the fairness concerns and the policy concerns that Petitioner raises and legislating appropriately. In asking the Court not to overturn its longstanding interpretation, we'd like to emphasize a couple of points. First, Petitioner's position would create a litany of practical problems that could harm state interests, and I'd like to go through a number of examples of those. First, imagine a situation in which State A has a tougher penalty for a particular type of conduct than does State B. That, of course, is the fact pattern of Heath v. Alabama. Under Petitioner's view, State A would not be able to vindicate its interest in that sterner prosecution if State B were to go first. That situation could also play out if a state has a sterner penalty for a particular act than does the federal government. This Court, of course, saw that in the Screws case, where the state penalty was much stronger than the federal penalty. We also see that in, for example, the area of robbery. Under federal law, a robbery of a U.S. letter carrier carrying U.S. mail is punishable by up to 10 years. In Texas, however, robbery is punishable by up to 20 years. Again, under Petitioner's view, Texas would not be able to vindicate its interest. I think what your friends on the other side might say to that is something along the lines of, well, it's one thing to pick the higher penalty and let the state or the government with the higher penalty go forward. The problem with this is that you can get both. Well, Your Honor, oftentimes, as a practical matter, there won't be both. But suppose another practical problem that would arise under Petitioner's theory. Suppose that a state had a particular interest in prosecuting a drug kingpin in that state. Suppose he's public enemy number one in a given state. Well, unbeknownst to the state, the U.S. government is also looking at that kingpin in connection with a different federal prosecution. Now, unbeknownst to the state, the federal government could enter into a plea agreement with that criminal in exchange for testimony in some other matter that's of great concern to the federal government. The states might not know about that until it's too late. And at that point, the states would not be able to vindicate their interest in prosecuting public enemy number one. And, of course, as the discussion earlier – That would certainly limit the willingness of the defendant to cooperate, if that was the rule. I'm sorry, Your Honor. If the defendant could be re-prosecuted by the state, that would be a disincentive to entering into a plea bargain if he can just be subject to prosecution by another sovereign for the same conduct. Your Honor, I suppose that may be theoretically true. But as my friend from the federal government indicated, we don't have any evidence that that's the case. And I don't believe that petitioner has pointed to any. As was discussed earlier, we could also see this play out as to foreign prosecutions. Imagine a situation involving an international drug lord, a Pablo Escobar type, for example. Suppose that Florida could show that this individual had trafficked large amounts of drugs into the state of Florida and devastated local Florida communities. Well, if a local Medellin prosecutor and a local Medellin jury were to try and either acquit Escobar or potentially give him a light sentence or something like that, that would, under petitioner's theory, forever prevent the state of Florida. Is the state of Congress engaged in Florida? Well, yes, Your Honor. If there were drugs being trafficked by Escobar and a cartel into the state of Florida, that would certainly implicate the interests of Florida. And under petitioner's theory – Yes, but I asked about the Columbia. If a crime is committed in Florida against Florida residents? Well, Your Honor, my hypothetical I'm making assumes that there's some sort of Colombian law against trafficking drugs out of that country into another country. We can certainly imagine that being the case in many scenarios. Other practical concerns that would arise, as my friend from the Department of Justice indicated, would involve races to the courthouse and competition between states and the federal government rather than cooperation, all to the detriment of law enforcement. And even setting aside these practical problems, there are a number of other concerns that petitioner's view would raise. First, under petitioner's view, courts around this country would be, for the first time, asked to apply Blockberger across the federal and state divide. That is no easy thing to do. This Court has experienced a taste of that in its armed career criminal act jurisprudence, where the Court has tried to do something similar to that, has developed a modified categorical approach and other doctrines to try to accomplish that. It's no easy matter to do that. That problem would even be compounded if this Court were to declare a ruling for a petitioner to be retroactive. Anybody who had been convicted or even charged, really, a second time based on similar conduct would challenge that prosecution as unconstitutional under this Court's rule. And then, of course, a court, in reviewing that, if the rule were retroactive, would have to go back through history and apply Blockberger, not just across the federal and state divide, but also as a historical matter as to offenses that may have changed over time. Finally, setting all of these practical problems aside, I think it's important to note that petitioner seeks to take us into uncharted waters. The rule that he imagines has never been the rule in this country until potentially now. The states and the federal government have never had to be concerned about who goes first. Under the law of unintended consequences, surely there are practical problems that would arise from petitioner's position that we may not have even thought about today. Unless there are further questions? Thank you, Counsel. Thank you, Your Honor. Mr. Chayton, four minutes remaining. I guess I'll pick up where he — thank you, Mr. Chief Justice. I'll pick up where he ended, which is that this has never been the rule in this country today. It is the rule in at least 20 states. It's the rule in 37 states with respect to certain crimes, and it all seems to have worked out okay. I did want to return to the issue of stare decisis and respond to what they were saying. We have a legal framework for answering stare decisis questions. It's a law of stare decisis, and I think it provides some pretty standard guidance on this. We have to be right on the merits. That's true. But if we're assuming we're right on the merits, then the question is, what else do we need to show? And I already told you about one key factor under this Court's jurisprudence, which is a jurisprudential change. I think incorporation is a pretty significant one. Second, there has been a massive expansion in federal law, as this Court has recognized. That was recognized by this Court in Murphy and Okins as the kind of changed factual circumstance that would justify revisiting an issue. Another issue is reliance, and, of course, reliance isn't really a relevant issue where you're talking about an unconstitutional law enforcement practice. And finally, this is a constitutional case. It is not a statutory case, and the Court's approach to stare decisis has been different in constitutional cases. Do you think there's less reliance here than there was on the issue of the Miranda Rule? Well, the issue is whether you're continuing an unconstitutional law enforcement practice. And my point is the Court has pointed out, Arizona began, that the Court has never allowed continuation of an unconstitutional law enforcement practice. So you think that any constitutional decision of this Court that imposes any limitation on any right in the Bill of Rights that affects criminal procedure is always open to reexamination without consideration of stare decisis because doing that would expand the rights of the criminal defendant. Your Honor, I'm not saying without consideration of stare decisis. I'm saying without consideration of reliance interests. Reliance, I mean, the obvious thing comes into my mind. I got the other factors. It seems, what's wrong with what I'm thinking, which must be something wrong with it, that very often this Court has said the rule of constitution is X, but we're not going to apply it retroactively because to do that would mean a vast release of prisoners who have committed crimes. Now, that sounds like reliance, and it sounds like reliance on a law that the Court has said is unconstitutional, which is the preceding situation. I don't think it's a reliance issue on addressing the underlying merits question. It's just whether to apply the law retroactively. Incidentally, and I don't think... Don't. I don't think... I'm sorry. The reason you don't apply the unconstitutional... The reason you still apply the unconstitutional law to all those people who are in prison is because of the reliance in the community on their staying in prison. Well, I think the reason you don't apply it is because the judgment's final, so I think it's a separate question from the underlying merits question, the underlying constitutional question. And incidentally, I don't think this rule would be retroactive. It's a procedural rule. It doesn't go to substantive. It's not a watershed rule, so I don't think that's a concern here. And then... And there have been many decisions of this Court that have imposed some limits on... have rejected some claims that have been asserted under the Fourth Amendment, under the Fifth Amendment right against self-incrimination, under the Sixth Amendment jury trial right and the right to ineffective assistance of counsel, under the Eighth Amendment right against cruel and unusual punishment. And if any of those was challenged, you would say there's no... There can never be a reliance, and because there's a... There never can be a reliance, and because it involves an individual right, we put stare decisis aside. So I'm not... There's more that goes into stare decisis than reliance. That's one factor. What I'm saying is that the Court has said that we will not rely on reliance in the case of an unconstitutional law enforcement practice. Thank you, Mr. Chief. Thank you, counsel. The case is submitted.